UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED-CLERK
U.S. DISTRICT COURT

2005 JUL 15 P 4: 17

|  |  |  |
|---|---|---|
| MICHAEL L. GALDIERI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | Civil Action No. 05CV3563 (JLL) |
| JERSEY CITY INCINERATOR | ) | |
| AUTHORITY; CITY OF JERSEY | ) | |
| CITY; JOSEPH M. GRANT, in his | ) | |
| individual and official capacities; ORIN | ) | |
| K. DABNEY, in his individual and | ) | |
| official capacities; JOSEPH | ) | |
| ZAZZARINO, in his individual and | ) | |
| official capacities; JAMES KING, in his | ) | |
| individual and official capacities; | ) | |
| THOMAS E. HARRISON, in his | ) | |
| individual and official capacities; | ) | |
| NORMAN M. GUERRA, in his | ) | |
| individual and official capacities; and | ) | |
| EUGENE DRATON, in his individual | ) | |
| and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

2005 JUL 15 P 4: 20
RECEIVED-CLERK
U.S. DISTRICT COURT

## COMPLAINT

COMES NOW, the Plaintiff, Michael L. Galdieri, who alleges, on

information and belief, as follows:

### PRELIMINARY STATEMENT

Plaintiff brings this action for blatant and egregious violations of his

constitutional and other legal rights.  Throughout his employment with the Jersey City

Incinerator Authority (the "JCIA"), Plaintiff's supervisors assailed him with racial slurs

and subjected him to obviously dissimilar and unfavorable treatment vis-à-vis other JCIA

employees.  In fact, notwithstanding Plaintiff's numerous requests for remedial action,

this clear and consistent pattern and culture of abuse was not just condoned, but actually

*fostered*, by his superiors. Moreover, when Plaintiff pursued his claims with the appropriate state and federal agencies, he became the target of severe and deliberate retaliatory and other unlawful conduct. As a direct and proximate result of defendants' reprehensible actions, Plaintiff seeks compensatory and punitive damages and other relief under both state and federal law.

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over Plaintiff's federal rights of action (Count I, *infra*) pursuant to 28 U.S.C. § 1331(a). Plaintiff also asserts several state law rights of action (Counts II-IV, *infra*), over which 28 U.S.C. § 1367 confers jurisdiction.

2.     Plaintiff has complied with all prerequisites (jurisdictional or otherwise) prior to commencing this action.

3.     Venue is proper under 28 U.S.C. § 1391(b).

## II.     JURY TRIAL DEMAND

4.     Plaintiff demands a jury trial.

## III.     PARTIES

5.     The Plaintiff, Michael L. Galdieri, is an adult Caucasian citizen of the United States of America. He resides at 158 Mallory Avenue, Jersey City, New Jersey 07304. His date of birth is February 17, 1962.

6.     The Defendant, JCIA, is an entity organized and existing under the laws of the State of New Jersey, and is a political subdivision, with its principal facility located at Route 440, Jersey City, New Jersey 07304. Said defendant at all times was acting through its agents, servants and/or employees, including (but not limited to) Joseph M. Grant, Orin K. Dabney, Joseph Zazzarino, James King, Norman M. Guerra, and Eugene

-2-

Draton, and, in addition, said defendant is believed to have been a political arm of defendant City of Jersey City, acting as its agent for all purposes.

7.      The Defendant, City of Jersey City, is an entity organized and existing under the laws of the State of New Jersey, and is a political subdivision, with its principal offices located at City Hall, 240 Grove Street, Jersey City, New Jersey 07302. Said defendant at all times pertinent hereto was acting through its agents, servants, and/or employees (including, but not limited to) JCIA, Joseph M. Grant, Orin K. Dabney, Joseph Zazzarino, James King, Norman M. Guerra, and Eugene Draton.

8.      The Defendant, Joseph M. Grant, is an adult African-American individual, whose last known residential address is 224 Wilkinson Avenue, Jersey City, New Jersey 07305, and whose last known business address is c/o JCIA, Route 440, Jersey City, New Jersey 07304. At all times pertinent hereto, said defendant was an agent, servant, and/or employee of defendants JCIA and City of Jersey City.

9.      The Defendant, Orin K. Dabney, is an adult African-American individual, whose last known residential address is 235 Wilkinson Avenue, Jersey City, New Jersey 07305, and whose last known business address is c/o JCIA, Route 440, Jersey City, New Jersey 07304. At all times pertinent hereto, said defendant was an agent, servant, and/or employee of defendants JCIA and City of Jersey City.

10.     The Defendant, Joseph Zazzarino, is an adult Caucasian individual, whose last known residential address is 38 Logan Avenue, Jersey City, New Jersey 07306, and whose last known business address is c/o JCIA, Route 440, Jersey City, New Jersey 07304. At all times pertinent hereto, said defendant was an agent, servant, and/or employee of defendants JCIA and City of Jersey City.

11.     The Defendant, James King, is an adult Caucasian individual, whose last known residential address is in or around St. Paul's Avenue and Kennedy Boulevard, Jersey City, New Jersey 07305, and whose last known business address is c/o JCIA, Route 440, Jersey City, New Jersey 07304.  At all times pertinent hereto, said defendant was an agent, servant, and/or employee of defendants JCIA and City of Jersey City.

12.     The Defendant, Thomas E. Harrison, is an adult Caucasian individual, whose last known residential address is 155 Canterbury Lane, Toms River, New Jersey 08757, and whose last known business address is c/o JCIA, Route 440, Jersey City, New Jersey 07304.  At all times pertinent hereto, said defendant was an agent, servant, and/or employee of defendants JCIA and City of Jersey City.

13.     The Defendant, Norman M. Guerra, is an adult Caucasian individual, whose last known residential address is unknown, and whose last known business address is c/o JCIA, Route 440, Jersey City, New Jersey 07304.  At all times pertinent hereto, said defendant was an agent, servant, and/or employee of defendants JCIA and City of Jersey City.

14.     The Defendant, Eugene Draton, is an adult African American individual, whose last known residential address is unknown, and whose last known business address is City Hall, 240 Grove Street, Jersey City, New Jersey 07302.  At all times pertinent hereto, said defendant was an agent, servant, and/or employee of defendant City of Jersey City, with direct supervisory responsibility and authority over any and all affairs of defendant JCIA.

-4-

## IV.    FACTUAL BACKGROUND

15.    Plaintiff officially commenced employment with the JCIA on or around January 22, 2002, though he actually began working for it on January 20, having been asked to assist due to a major snowstorm. Plaintiff's title was Equipment Operator, the duties of which generally included operating motorized equipment and vehicles. It was on that date that Plaintiff encountered defendant Grant, Plaintiff's immediate supervisor, for the first time.

16.    While plowing sidewalks, Plaintiff saw defendant Grant, his immediate supervisor, at which point he stopped what he was doing, walked to Mr. Grant's vehicle, and introduced himself by extending his hand. Mr. Grant looked at Plaintiff, smirked, then rolled up the window of his vehicle and left.

17.    From this point forward, it became increasingly clear to Plaintiff that defendant Grant did, in fact, have it "in for him," and primarily so because of his race.

18.    In or around March 2002, Plaintiff began to be racially harrassed while on the job, and in the presence of Plaintiff's coworkers was referred to by defendant Grant in racially derogatory ways.

19.    For instance, on or around March 13, 2002, Cordell Nesbitt, one of Plaintiff's coworkers, witnessed defendant Grant calling the Plaintiff as a "white devil." The incident occurred at a work site during working hours. Mr. Nesbitt promptly informed Plaintiff of defendant Grant's bigoted comment.

20.    Defendant Grant's above-described, deplorable conduct recurred in a similar, continuous, and substantial manner, instances of which will be alleged more specifically herein. In or around April 2002, defendant Grant's harrassment began to

take the form of unlawful, racially-motivated, and/or retaliatory adverse employment actions materially impacting Plaintiff's professional record with defendant JCIA.

21.     The first such action known to Plaintiff occurred on or around April 12, 2002, when defendant Grant wrote up (*i.e.*, issued a written warning to) Plaintiff for not being "at his assigned [work] location at Journal Square (1:45 – 2:16)." One of his co-workers for that day, Adam Zielinski, also Caucasian, was also written up. This allegation was patently untrue; indeed, defendant Grant's account as expressed in the written warning was substantially different than that for which Plaintiff and his co-workers were told by defendant Grant they were being disciplined.

22.     More importantly, however, is that notwithstanding the fact that each member of Plaintiff's crew vehemently denied this allegation, a third crew member, Frederick Marshall, an African American, received only a verbal warning (a lesser disciplinary sanction) for the same alleged conduct. Plaintiff had never received a verbal warning prior to this time, and was eligible for, and should have received, similar treatment.

23.     On or around May 23, 2002, Plaintiff, Anthony Edgarton, and Mr. Zielinski presented to defendant Dabney, defendant Grant's immediate supervisor, a written complaint regarding defendant Grant's continued harrassment and disparate and demeaning treatment of Plaintiff, to wit:

a.     stating to Plaintiff that he would "have to ask to do anything," *including using a bathroom*;

b.     relentlessly and unnecessarily observing and scrutinizing

Plaintiff's every action, in a manner greatly disproportionate to time spent supervising

other, similarly situated employees, with the intent to belittle and intimidate Plaintiff; and

c.     routinely, and without cause or notice, altering daily routines and

procedures in an effort to manufacture disciplinary action against Plaintiff, as well as to

intimidate Plaintiff and to cause him to suffer great emotional distress and other

psychological harm, which Plaintiff did in fact suffer.

24.     In spite of being aware, from Plaintiff's numerous oral complaints, that a

problem existed among their subordinates, neither defendant Dabney nor defendant

Zazzarino took any remedial measures to decrease or eliminate Plaintiff's day-to-day

contact with defendant Grant. In fact, they completely ignored Plaintiff's concerns,

which permitted — and indeed, encouraged — defendant Grant's harassment of Plaintiff

to become even worse.

25.     For example, defendant Grant actively campaigned within the JCIA to

have stopped Plaintiff's transfer to a new position that he had been told he was going to

receive. Although Plaintiff was eventually granted this change of position (to

Environmental Inspector), defendant Grant's actions delayed Plaintiff from receiving the

transfer for several months. (In fact, as discussed below, it was only after Plaintiff

contacted the Equal Employment Opportunity Commission ("EEOC") that the transfer

was finally approved, and soon thereafter that it became clear that JCIA's actions were

taken solely as a *quid pro quo* to "encourage" Plaintiff to withdraw his EEOC filings.)

26.     In addition, defendant Grant routinely and without cause or notice

changed the duties of Plaintiff, an Equipment Operator, to those that were supposed to be

-7-

carried out by less qualified employees. These duties included such menial tasks as manually cleaning lots, which were jobs normally given to those holding the title of Laborer. Such actions were taken with the intent to belittle and intimidate Plaintiff and to cause him to suffer great emotional distress and other psychological harm, which Plaintiff did in fact suffer.

27.     Defendant Grant's racial animus toward Plaintiff became even more obvious when Plaintiff received his second write up from Mr. Grant.

28.     On or around June 5, 2002, Plaintiff was assigned to work at Journal Square, and was given a written warning by defendant Grant for failing to wear a safety vest. Plaintiff had never before been told to wear a safety vest while working at Journal Square. However, Mathis Sharpless, one of Plaintiff's co-workers and an African-American, was not written up, or even verbally warned, for the very same conduct that led to Plaintiff's disciplinary action. Indeed, Mr. Sharpless had never been asked, told, or otherwise instructed by defendant Grant to wear any type of safety vest while working at Journal Square.

29.     Later in the day, after receiving this write up, Plaintiff was standing next to the time clock when defendant Grant approached him and stated, "Got you, white cracker."

30.     In response to this latest instance of racial harassment, Plaintiff promptly contacted Mel Prince at the Jersey City Human Rights Office. Mr. Prince took notice of the situation and referred Plaintiff to the EEOC.

31.     It was only after this measure was taken, and presumably at Mr. Prince's
prompting, that defendant Dabney called a meeting which included Plaintiff, defendant
Grant, defendant Zazzarino, Mr. Edgarton, and Mr. Zielinski.

32.     The meeting accomplished nothing constructive, as defendant Grant failed
to cease his ongoing pattern of harassment.

33.     On or around June 11, 2002, Plaintiff communicated to defendants Grant
and Dabney that he was contacting the EEOC, which he promptly did on June 13, 2002.
Approximately one week thereafter, Plaintiff received an "Intake Questionnaire," which
was completed and returned to the EEOC on or around July 5, 2002.

34.     On July 29, 2002, Plaintiff was, after several months' delay, finally
transferred to the position of Environmental Inspector and thus out of defendant Grant's
supervision.

35.     However, because Plaintiff believed strongly that defendant Grant needed
to be stopped from victimizing Plaintiff or other employees in the future, he did not
withdraw or otherwise discontinue his EEOC action.  As a consequence, Plaintiff was
about to suffer many more months of discrimination, harassment, and/or retaliation from
and/or with the knowledge of the defendants named in this Complaint.

36.     Several of the named defendants (including, but not necessarily limited to,
defendants Grant, Dabney, Zazzarino, King, Harrison, and Guerra), conspired to hinder
or even block Plaintiff from carrying out his assigned duties in an effort to manufacture
disciplinary action against Plaintiff, and to cause him severe emotional distress.  Said
defendants also acted to knowingly place Plaintiff into potentially dangerous law

enforcement situations under conditions clearly demonstrating a reckless disregard for Plaintiff's physical safety.

37. For example, in or around early October, 2002, Plaintiff notified defendant Harrison that even though an area had been identified as a "known illegal dump site," and had been cleaned up by the Authority several times, JCIA employees were continuously failing to block off unlawful access to the area, thus requiring numerous unnessary, and progressively more dangerous, enforcement efforts by Plaintiff.

38. In addition, defendant Harrison required Plaintiff to utilize a highly visible and marked white Jeep to conduct his enforcement activities, notwithstanding the fact that defendant Harrison knew the covert nature of the activities Plaintiff was policing, as well as the necessity of conducting the types of enforcement activities which Plaintiff was asked to conduct in an undercover fashion for reasons of effectiveness and safety.

39. Defendant Harrison also knew of the importance of requiring random and varied shifts to prevent violators from knowing the working hours of Inspectors such as Plaintiff, yet nevertheless required Plaintiff to work fixed shifts.

40. Matters became even worse for Plaintiff following a meeting that took place on or around October 10, 2002, between Mr. Nesbitt, the JCIA employee who witnessed defendant Grant call Plaintiff a "white devil," and defendants Grant, Dabney, and Zazzarino.

41. It had come to the attention of said defendants prior to the meeting that Mr. Nesbitt was prepared to testify to the EEOC on behalf of Plaintiff in order to confirm certain of Plaintiff's allegations.

-10-

42.     During this meeting, said defendants overtly engaged in an attempt to "cover-up" the truth by attempting to unlawfully coerce or otherwise induce Mr. Nesbitt to recant his prior statements supporting Plaintiff's allegations and to instead corroborate defendant Grant's version of events. Such conduct included, but was not limited to:

    a.     making veiled threats of termination to Mr. Nesbitt if he did not comply with their demands;

    b.     misleading Mr. Nesbitt by telling him that he was not permitted to tell the EEOC certain things regarding defendant Grant's clear pattern of similar behavior;

    c.     discouraging Mr. Nesbitt from assisting with the EEOC's investigation by telling him that nothing would happen even if he did make a statement supporting Plaintiff's allegations;

    d.     offering Mr. Nesbitt material incentives for his favorable testimony, such as extra vacation time.

43.     Mr. Nesbitt ultimately resisted these attempts, which made Plaintiff's work environment more hostile, and his treatment by superiors more disparate and oppressive than ever before.

44.     To one such instance, between August 2002 and June 2003, Plaintiff was required, as a condition of his continued employment, to submit to drug tests on at least four occasions, even though each and every test yielded a negative result. Most, if not all, JCIA employees were never asked to submit to more than one such test, even though the JCIA's policy was that absent unusual circumstances, drug tests were supposed to be administered on a random basis. Moreover, some employees, including defendants

-11-

named in this Complaint, were arbitrarily exempted from having to submit to any drug screenings at all.

45.     On October 16, 2002, in response to requests by Plaintiff for changes to JCIA procedures that would undoubtedly have allowed Plaintiff to perform his duties with far greater safety and efficacy (to wit, varied shifts and the use of unmarked vehicles), defendant Harrison sent Plaintiff a memorandum stating that "Executive Staff feels that it is unnecessary to have Inspectors work [varied shifts] as well as having you work in an unmarked/non-visible nature."

46.     Defendant Harrison also suggested that Plaintiff's shift would be changed to times that were known to be both inconvenient for Plaintiff generally, as well as highly detrimental to Plaintiff's ability to effectively perform his job.  Such shift changes, intended to harass Plaintiff and retaliate against him, occurred on a frequent, unpredictable, and unwarranted basis up until the time Plaintiff was terminated.

47.     On or around October 22, 2002, Plaintiff was requested to call defendant King. (Chairman Bd. Of Comm J.C.I.A) Plaintiff did so, at which point defendant King demanded that Plaintiff make the EEOC complaint against defendant Grant "go away". He also told Plaintiff that he "had only been an employee [at the JCIA] for six months," and that "we had you moved already" (thus further evidencing the *quid pro quo*-based intent behind Plaintiff's job change).  Plaintiff responded that he was not planning on doing so, and offered defendant King the opportunity to meet with Plaintiff privately to discuss the matter.  Defendant King responded that there was no need to discuss the matter any further and that he wanted Plaintiff to "drop or pull the [EEOC] complaint."

48.     On or around November 21, 2002, defendant Harrison sent Plaintiff a memorandum stating that it "has been brought to [his] attention that during [Plaintiff's] work hour's unauthorized activities may be taking place." Specifically, defendant Harrison was alleging (1) that Plaintiff's driving a fellow employee to his home outside city limits was not permitted, and (2) that Plaintiff was circulating a petition and asking JCIA employees to sign the petition at their homes during working hours. However, to the former, defendant Harrison knew full well that Plaintiff's actions were entirely consistent with a longstanding courtesy extended to all Jersey City employees, and to the latter, had defendant Harrison conducted even a perfunctory investigation of the allegation — if indeed such an allegation even existed — he would have found it to lack even remote truth.

49.     In or around early 2003, it became a top priority of the defendants named herein to "get rid" of Plaintiff. Because Plaintiff's job performance at the JCIA was well above average, they focused their efforts on manufacturing a way to terminate his employment.

50.     On or around March 10, 2003, Plaintiff was written up for allegedly failing to clock out at the end of his shift a number of times and for arriving late four times. This latest adverse action was clearly another step in defendants' attempt to manufacture grounds for Plaintiff's termination. It was common knowledge at the JCIA at this time that the time clock was and had been broken on many, if not all, of the days relevant to the substance of the write up. In addition, Plaintiff was working an evening shift, and the door leading to the time clock had deliberately been locked so that Plaintiff would be unable to properly clock out. In addition, this write up fails to mention that on

-13-

several occasions, Plaintiff arrived within the grace period given to all employees, and therefore was not actually late for work.

51.     On or around April 11, 2003, Plaintiff was again written up, this time for failing to notify the Authority of his absence the day before. However, due to extenuating and unforeseen circumstances relating to air travel on his return from vacation, Plaintiff was only able to ask Thomas Curtis, a fellow inspector and the only employee whose contact information Plaintiff was able to access, to notify the JCIA of his impending absence, which Mr. Curtis subsequently did. Nevertheless, and in the face of having considered this an acceptable procedure in the past, defendants refused to allow Plaintiff this same latitude; indeed, they flatly refused to hear his explanation.

52.     As another instance of defendants' knowing and wanton disregard for Plaintiff's safety, defendants required Plaintiff to conduct potentially dangerous field enforcement activities with broken radio equipment. Plaintiff repeatedly informed the appropriate personnel of the problems, but nothing was done to address them. In fact, rather than fixing the problem, defendants instead ordered all remaining functional radio equipment, such as handheld radios, to be taken out of service.

53.     In the ensuing weeks, in furtherance of their attempt to manufacture disciplinary action against Plaintiff, defendants' harassment interestingly took the form of issuing reprimands when Plaintiff would do exactly what his job required. For example, on or around April 22, 2003, Plaintiff was responsible for requesting the impoundment of 32 vehicles located on city property without license plates. Upon discovering the situation, Plaintiff contacted the Jersey City Police Department, which informed Plaintiff that no police authority was needed to impound such vehicles. This resulted in the

-14-

aversion of potential safety hazards, as well as the commendation of Plaintiff and his co-workers by community leaders, residents, and elected officials.

54.     However, on or around April 23, 2003, defendant Harrison sent Plaintiff a memorandum stating that he had instructed the towing agency involved not proceed, that Plaintiff lacked the authority to take the action that he did, and that "[p]roper procedures were not followed . . . therefore, if any expenses are incurred by the Authority reimbursement needs to occur." The memorandum further instructed Plaintiff to write a signed statement "prior to" returning to his field work.

55.     Defendant Harrison knew that his reimbursement threat was improper and very likely contrary to established labor law. In addition, defendants knew full well that Plaintiff did possess the authority to take the actions he did, as the city was notified in a December 19, 1994 memorandum from Edwin Lawler, an official with New Jersey's Division of Motor Vehicles, that the JCIA may take possession of abandoned motor vehicles and that New Jersey law clearly provides for this authority.

56.     On or around May 21, 2003, Plaintiff was written up for failing to call in to report his absence from work that day. However, Plaintiff did in fact call in on two separate occasions. He was instructed at the time of his last absence (of which Plaintiff also timely notified the Authority) to call extension 646, which he did on his first attempt. That extension was not staffed, however; therefore, Plaintiff contacted security and left a message notifying the Authority of his absence for the day. Defendants denied receiving this, an assertion that is clearly contradicted by Plaintiff's telephone records.

57.     On or around May 28, 2003, Plaintiff was again written up for not notifying the Authority of his absence. He did contact the Authority late, but this was

-15-

due to the acute nature of his illness.  Defendants did not conduct any investigation into these circumstances, and they ignored Plaintiff's requests to take into account a valid medical excuse.  On other occasions and for other employees, however, defendants opted not to take disciplinary action when presented with similar circumstances.

58.    In or around early June 2003, defendant King stated in a conversation with Mr. Curtis that what was happening to Plaintiff at the Authority "has nothing to do" with Plaintiff's being late or failing to call in; rather, it was because of Plaintiff's EEOC complaint and his refusal to withdraw it when requested to do so.  Defendant King also admitted that "Orin [defendant Dabney] has just been building a file and biding time."

59.    On June 12, 2003, Plaintiff was suspended indefinitely.

60.    In a letter dated July 16, 2003, Plaintiff was notified by letter that he was officially terminated "from further employment with the JCIA."

## V.    CAUSES OF ACTION

### COUNT I
### (All defendants)

### 42 U.S.C. §§ 1983, 1985, 1986, 1988

61.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 60 inclusive, as though they were set forth more fully at length herein.

62.    The facts described herein constitute "continuing violations," in that the discriminatory and/or retaliatory conduct is part of an ongoing practice or pattern of discrimination on the part of the defendants.

63.    At all times mentioned herein, defendants were acting under the color of law, to wit, under the color of the statutes, ordinances, regulations and policies, customs and uses of the City of Jersey City.

-16-

64.     The City of Jersey City and the JCIA are public bodies organized and existing under the laws of the State of New Jersey with their principal offices located as set forth above.

65.     Defendants, under color of law, violated and/or conspired to violate certain rights guaranteed by United States Constitution by wantonly, purposefully and without just cause racially harassing the Plaintiff and retaliating against him and otherwise discriminating against him by the unlawful actions described above. This cause of action is brought pursuant to Title 42 of the United States Code, Sections 1983, 1985 and 1988, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.

66.     Defendants were "State actors" and were acting under "color of State law."

67.     Defendants are "persons" subject to suit.

68.     Defendants violated Plaintiff's clearly established constitutional and statutory right as set forth in this Complaint. Defendants also violated Plaintiff's constitutional right of access to the courts.

69.     Plaintiff was denied the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution, by the intentional discrimination as set forth herein.

70.     Defendants violated Section 1986 of Title 42 of the United States Code by having knowledge of the wrongs conspired to be done, and, having the power to prevent the commission of same, neglected and/or refused to do so. Defendants are liable to Plaintiff for having failed to prevent such acts which they, through the exercise of

-17-

reasonable diligence, could have prevented. Defendants knew of the conspiracy and despite the power to prevent the same or aid in its prevention, failed to do so, resulting in Plaintiffs damages.

71.    Plaintiff makes claim for damages recoverable under Section 1988 of Title 42 of the United States Code.

72.    The discrimination described above has been intentional, reckless, grossly negligent and/or negligent. Further, there existed a conspiracy to violate Plaintiff's rights in violation of Sections 1985 and 1986 of Title 42 of the United States Code.

73.    Defendant Grant and/or others had a history of committing racially discriminatory acts, and in spite of said history which was known and/or should have been known by defendants, he was allowed to continue in his position without adequate means to prevent the discrimination which the Plaintiff suffered.

74.    Defendants have maintained an inadequate system of review of the acts of their officers, agents, and/or subordinates relating to intentional or other acts of race discrimination, all of which lead to the unconstitutional and illegal deprivations of Plaintiff's rights, as well as of the infliction of injury and emotional distress due to defendants' conduct.

75.    Said inadequate system of review has failed to identify instances of:

a.    illegal discrimination on the basis of race by supervisory employees and/or other agents, servants, and/or employees;

b.    instances of race discrimination by defendant Grant and/or others;

c.    instances of retaliation for attempted enforcement and/or assertion of the rights secured under law;

-18-

    d.  conspiracies in an attempt to deprive the above-named rights; and

    e.  unlawful conspiracies to cover up violations of civil rights as set

forth above;

  76.  Defendants failed to discipline, terminate, more closely supervise, or

retrain officers who, in fact, improperly committed the acts alleged in the foregoing

paragraph.  Such failure to train was with deliberate indifference to the rights of the

Plaintiff and directly led to the constitutional and statutory right violations in this case.

Further, prior to the dates of Plaintiff's loss of rights, defendants permitted, encouraged,

tolerated and ratified a pattern and practice of instances of the above cited constitutional

and statutory violations so that officers routinely violated such rights.

  77.  Defendants encouraged, permitted, tolerated and ratified the patterns

of conduct set forth in the previous paragraphs in that:

    a.  defendants failed to discipline or prosecute any or in any way deal

with incidences of said practices;

    b.  defendants refused to investigate complaints of previous similar

practices, instead officially claiming that such practices were justified and proper;

    c.  by means of both action and inaction and cover up of such

practices, defendants encouraged officers, servants, and/or employees to believe that such

conduct was permissible;

    d.  defendants indeed encouraged such ignorance of proper conduct

and procedure and directly encouraged the commission of the above acts; and

    e.  defendants retaliated against individuals who asserted their rights

against discrimination.

78.     On information and belief, the systematic deficiencies include but are not limited to:

a.      preparation of investigative reports designed to vindicate officers' actions which in reality were violations of constitutional and/or statutory rights.

b.      preparation of investigative reports which critically rely solely upon the word of the supervisory officers involved in the incident and which systematically fail to accredit testimony by subordinate individuals involved;

c.      preparation of investigative reports which omit factual information and physical evidence which corroborates the accounts of the victims;

d.      failure to review investigative reports by responsible superior officers for accuracy or completeness and acceptance of conclusions which are unwarranted by the evidence and/or which contradict such evidence;

e.      covering up constitutional and statutory violations and "sweeping them under the carpet"; and

f.      retaliating against individuals who asserted their rights against discrimination.

79.     Defendants have consciously and/or in a grossly negligent fashion and with a reckless disregard for the rights of citizens, failed to train or retrain the officers in the fundamental law of race discrimination, which directly led to the Plaintiffs damages.

80.     The foregoing acts, omissions, systematic deficiencies, polices and customs of defendants have caused defendants' employees to be unaware of the rules regarding the proper relations between individuals of different races in a work environment, or to believe that they may illegally discriminate.  Said acts, omissions,

systematic deficiencies, policies, and customs of defendants have caused defendants'
employees to believe that the above-described actions are entirely within the discretion of
the officer or employee and that abuses would not be honestly and properly investigated,
all with the foreseeable result of the officers/employees acting as they did in the instant
case.

81.     Defendants knew or should have known that defendants and other
officers were routinely violating citizens' rights in the above-described fashion such that
hiring and continuing the employment of said defendants violated Plaintiff's civil rights
as outlined herein.

82.     Defendants, by their extreme and outrageous conduct, intentionally and/or
recklessly and/or in a grossly negligent fashion caused severe emotional distress to
Plaintiff, who did, in fact, suffer such distress and will in the future suffer such distress,
all as a result of defendants' conduct as previously set forth herein.

83.     The above-described actions of defendants were extreme, outrageous, and
beyond all possible bounds of decency, and as such are to be regarded as atrocious,
outrageous, and utterly intolerable in a civilized community.

84.     As a direct result of the above-described actions of defendants, Plaintiff
suffered highly unpleasant mental reactions, such as fright, horror, shame, humiliation,
embarrassment, anger, chagrin, disappointment, worry, anxiety, etc.

85.     The emotional distress suffered by Plaintiff is severe such that no
reasonable person could be expected to endure it, especially given the intensity and
duration of defendants' illegal conduct.  Plaintiff's severe emotional distress has resulted
in physical manifestations thereof.

86. As a direct and proximate result of the above-described course of conduct of defendants, Plaintiff will, in the future, suffer severe emotional distress as he has already suffered in the past.

87. As a result of the foregoing acts, omissions, systematic deficiencies, policies, procedures, and customs of defendants, Plaintiff has suffered deprivation of numerous constitutional and statutory rights and liberties.

88. As a direct and proximate result of the foregoing course of conduct of defendants, Plaintiff has suffered all of the damages set forth in this Complaint.

## COUNT II
### (All defendants)

### NEW JERSEY LAW AGAINST DISCRIMINATION, N.J.S.A. 10:5-1 *et seq.*

89. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 88 inclusive, as though they were set forth more fully at length herein.

90. Plaintiff was unlawfully discriminated against, in violation of the New Jersey Law Against Discrimination ("NJLAD"), as evidenced by the facts alleged herein.

91. Defendants treated Plainitff differently because of his race and/or knowingly permitted such treatment.

92. Defendants retaliated against Plaintiff because he complained of harassment, further retaliated against Plaintiff for filing claims of discrimination based on his race, and opposed discriminatory practices prohibited by the NJLAD.

93. Defendants are responsible fort the foregoing acts of discrimination and/or retaliation, as well as their failure to take any immediate and/or successful corrective action to prevent continuing violations of the NJLAD.

94.     The foregoing acts of defendants constitute unlawful discrimination against Plaintiff because of his race, in violation of the NJLAD.

95.     As a direct and proximate result of defendants' willful violations of the NJLAD, defendants owe Plaintiff for all of the damages set forth in this Complaint.

96.     Defendants aided and abetted violations of the NJLAD by directly discriminating and/or retaliating against Plaintiff and by entering into conspiracies to engage in acts which violate the NJLAD.

97.     Defendants also aided and abetted violations of the NJLAD by failing to act to prevent unlawful race discrimination, retaliation, and/or harassment by their agents, servants, and/or employees.

## COUNT III
### (All defendants)

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

98.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 97 inclusive, as though they were set forth more fully at length herein.

99.     Defendants, by their above-mentioned words and actions, acted in an extreme and outrageous fashion, intentionally and/or recklessly causing severe emotional distress and psychological harm to Plaintiff.

100.    The conduct noted above goes beyond all possible bounds of decency and is such as would be regarded as atrocious and utterly intolerable in a civilized community.

101.    Plaintiff has suffered and continues to suffer severe emotional distress and highly unpleasant mental reactions, including, but not limited to, fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry.

102.    The emotional distress was severe such that no reasonable person could be expected to endure it.

103.    As a direct and proximate result of the above-described course of conduct, Plaintiff has suffered and continues to suffer severe emotional distress and psychological injury which has been to his great financial loss.

104.    As a direct and proximate result of the above-described course of conduct, Plaintiff has suffered great mental anguish and psychological injury up to the date of the filing of this Complaint, all of which has been to his great financial loss.

105.    As a direct and proximate result of the above-described course of conduct, Plaintiff will continue to suffer great mental anguish and psychological harm into the future, all of which will be to his great financial loss.

106.    As a direct and proximate result of the above-described course of conduct, Plaintiff has been forced to expend large sums of money due to the nature of his condition, and will have to continue to do so in the future.

107.    As a direct and proximate result of the above-described course of conduct, Plaintiff has been unable to pursue his usual occupation for periods of time from the date of the incidents upon which this cause of action is based and up to the date of the filing of this Complaint, and has suffered lost wages and other lost employment benefits up to the date of the filing of this Complaint, all of which has been to his great financial loss.

108.    As a direct and proximate result of the above-described course of conduct, Plaintiff will be unable to pursue his usual occupation for periods of time into the future, and will suffer lost wages and other lost employment benefits into the future, all of which has been to his great financial loss.

-24-

109.   As a direct and proximate result of the above-described course of conduct, Plaintiff has been unable to pursue and enjoy the usual activities of life of an individual of Plaintiff's age, and has suffered a loss of enjoyment of life, loss of life expectancy, loss of happiness, and loss of the pleasures of life up to the date of the filing of this Complaint, all of which has been to his great financial loss.

110.   As a direct and proximate result of the above-described course of conduct, Plaintiff will, in the future, be unable to pursue and enjoy the usual activities of life of an individual of Plaintiff's age, and he will suffer a loss of enjoyment of life, loss of life expectancy, loss of happiness, and loss of the pleasures of life throughout the remainder of his life, all of which will be to his great financial loss.

111.   As a direct and proximate result of the above-described course of conduct, Plaintiff will, in the future, suffer loss of earning capacity, all of which will be to his great financial loss.

## COUNT IV
## (Defendants Jersey City Incinerator Authority, City of Jersey City, Dabney, Zazzarino, King, Guerra, and Draton)

### NEGLIGENT RETENTION OF EMPLOYEES

112.   Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 111 inclusive, as though they were set forth more fully at length herein.

113.   Defendants, as employers and/or supervisors of Plaintiff, owed to Plaintiff a duty of care to ensure that Plaintiff was not harmed by dangerous or otherwise unfit employees.

-25-

114.    Defendant Grant was in fact a dangerous and unfit employee, and defendants knew or should have known this due to defendant Grant's prior conduct, actions, and propensities, including, but not necessarily limited to:

a.    multiple instances of racial and other discrimination of JCIA employees;

b.    multiple instances of threatening, physically or otherwise, JCIA employees;

c.    theft of another JCIA employee's property on JCIA premises;

d.    impersonation of a police officer; and

e.    multiple instances of assault and/or battery, of both a physical and/or sexual nature.

115.    Defendants had actual knowledge of the qualities, attributes, actions, propensities, and/or patterns of conduct of defendant Grant as alleged in the foregoing paragraph, and could easily have foreseen from this knowledge that defendant Grant's continued employment at the JCIA posed a substantial risk of harm to other JCIA employees such as Plaintiff.

116.    Defendants consciously disregarded this risk by failing to terminate, discipline, or even reassign defendant Grant. Such failure was committed with deliberate indifference to Plaintiff's rights and well-being, and directly and proximately resulted in Plaintiff's damages as set forth in this Complaint.

-26-

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against

defendants, whether jointly, severally, or in the alternative, and an award granting him

relief including, but not limited to, the following:

          a.     compensatory and punitive damages in an amount exceeding

$2,000,000.00 (two million dollars);

          b.     any equitable remedy that this Court deems appropriate under the

circumstances;

          c.     costs, disbursements, and reasonable attorney's fees, should an

attorney appear on Plaintiff's behalf during the pendency of this action; and

          d.     any other and further relief that this Court deems just and proper.


Respectfully submitted,


Michael L. Galdieri
158 Mallory Avenue
Jersey City, New Jersey 07304
(201) 484-7854

*Pro Se* Plaintiff

2005 JUL 15 P 4:17

U.S. DISTRICT COURT
RECEIVED-CLERK